UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANDREW EVAN HOWLAND,                )
                                    )
              Plaintiff,            )
                                    )
v.                                  )  No. 1:22-cv-02359-JPH-MKK
                                    )
JACKSON COUNTY SHERIFF'S            )
DEPARTMENT, et al.,                 )
                                    )
              Defendants.           )

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SANCTIONS, AND DIRECTING ENTRY OF FINAL JUDGMENT**

Federal inmate Andrew Evan Howland filed this civil rights action alleging violations of his rights by individuals involved in his arrest and prosecution. Dkt. 1. He proceeds on claims under the Fourth Amendment and Federal Wiretap Act. Dkt. 82 at 7.

Defendants moved for summary judgment. Dkt. [108]. For the reasons that follow, Defendants' motion for summary judgment is **GRANTED**.

**I.**
**Plaintiff's Motion for Sanctions**

As an initial matter, Mr. Howland has moved for sanctions under Federal Rule of Civil Procedure 37, addressing many of the same discovery issues he previously made in his motion to compel, dkt. 119, and his motion to reopen discovery, dkt. 121. Dkt. 122. The Court denied those motions.  Dkt. 125.

Mr. Howland argues that (1) "Defendants did not serve their Initial Disclosures on the Plaintiff until 12/23/24, three months after they were

1

initially due," and (2) that Defendants did not timely respond to his January 2025 discovery requests. Dkt. 122 at 2. The Court has already addressed these arguments, explaining that "[m]otions to compel must be filed within 60 days of receipt of the inadequate discovery response or deadline to respond if no response was provided." Dkt. 125; dkt. 88 at 8. Mr. Howland's request for sanctions based on Defendants' initial disclosures and late discovery responses is denied because he waited too long to file a motion to compel regarding these issues. Mr. Howland's motion to compel, dkt. 119, and his motion to reopen discovery, dkt. 121, as they related to the initial disclosures or discovery responses, were denied on the same grounds. Dkt. 125.

Mr. Howland next argues that Defendants should be sanctioned because they filed affidavits in support of their summary judgment motion that were not disclosed during the discovery period. Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to provide to another party "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses . . . identifying the subjects of the information." The purpose of this rule is to require a party to provide the other side with the identities of witnesses who may have relevant information. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 947 (7th Cir. 2024). Here, Mr. Howland already knew Defendants' identities, as they are the parties he chose to sue.  He has not shown that Defendants failed to comply with their disclosure obligations or otherwise engaged in misconduct.  *See Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th

2

Cir. 1997). Nor has he shown that he was prejudiced in any way by Defendants' submission of declarations in support of their motion for summary judgment. *See Neita v. City of Chicago*, 148 F.4th 916, 929 (7th Cir. 2025) ("Rule 37 . . . provides recourse for parties actually harmed by a litigant's noncompliance with disclosure obligations. It does not safeguard a party's decision to sense an error, seize on it, and then, when it is resolved, claim incurable harm in the face of apparent remedies.").

Mr. Howland's motion for sanctions is therefore **denied.** Dkt. [122].

## II.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

3

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

**III.**
**Factual Background**

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Howland and draws all reasonable inferences his favor. *Khungar,* 985 F.3d at 572–73.

### A. The Parties

Plaintiff Andrew Howland is a federal inmate serving a 30-to-105-year sentence for multiple crimes related to child pornography and to the kidnapping and sexual abuse of a 13-year-old child, MJC. *Commonwealth v. Howland,* 289 A.3d 58, 2022 WL 16832489 at *1 (Pa. Super. Ct. Nov. 9, 2022). Mr. Howland was 38 years old when he began communicating with MJC via Snapchat regarding sexual matters in fall of 2020. *Id.* On December 2, 2020,

Mr. Howland traveled from Lancaster County, Pennsylvania to the state of Indiana, picked up MJC without the knowledge or permission of MJC's parents, and brought him to Lancaster. *Id.*

Defendant J.L. McElfresh is and was employed by the Jackson County, Indiana, Sheriff's Department as a detective. Dkt. 111-3 at 1 (Affidavit of J.L. McElfresh). He was one of the detectives assigned to investigate MJC's disappearance. *Id.* at 2.

Defendant William Dishman is and was employed by the Jackson County Sheriff's Department as a deputy sheriff. Dkt. 111-4 at 1 (Affidavit of William Dishman). He was assigned to assist in locating MJC. *Id.*

Defendant Bethany McElfresh is and was employed by the Jackson County Sheriff's Department as a dispatcher. Dkt. 111-5 at 1 (Affidavit of Bethany McElfresh). She received the report of a missing 13-year-old named MJC.

**B. Jackson County Sheriff's Department Investigation**

In the early morning hours of December 1, 2020, MJC's mother discovered that he was missing from his bedroom. Dkt. 111-3 at 1; dkt. 111-4 at 1. MJC's mother called the Jackson County Sheriff's Department and officers were dispatched to the child's home to assist in locating MJC. Dkt. 111-3 at 2; dkt. 111-4 at 2. MJC's mother was frantic, explaining that MJC was missing, he was suicidal and battling depression, and that she feared that MJC committed suicide. Dkt. 111-3 at 2; dkt. 111-4 at 2. MJC's mother

explained that he did not really go anywhere or talk to anyone. Dkt. 111-3 at 2; dkt. 111-4 at 2.

The Jackson County Sheriff's Department began checking with friends and neighbors and assessing local river access points and the high school. Dkt. 111-3 at 2; dkt. 111-4 at 3-4. After the police left the residence, MJC's mother called the Jackson County Sheriff's Office and spoke with Deputy Dishman and conveyed that MJC had been communicating online with an older man named Andrew. Dkt. 111-3 at 2; dkt. 111-4 at 2. MJC's mother told Deputy Dishman that she was able to gain access to MJC's Snapchat to obtain this information. Dkt. 111-4 at 2. MJC's mother also told Deputy Dishman that there were "snaps" from Andrew, username "official_roo82," stating things like "I'm counting down the day until I get to see you" and "I can't wait to hold you in my arms." *Id.*

Knowing that MJC had experienced suicidal ideation and had been communicating with an unknown adult on Snapchat, Deputy Dishman sent a law enforcement request for information via email to Snapchat requesting information about the username "official_roo82." *Id.* at 3. That same evening, Deputy Dishman received an email response from Snapchat stating that they could not verify Deputy Dishman's email address as being associated with a government entity that they recognized. *Id.* Snapchat gave Deputy Dishman a different email to send his request to, and he again requested information associated with the Snapchat username "official_roo82." *Id.* In the email, Deputy Dishman explained that he "was working a runaway/possible abducted

6

juvenile case, and that her well-being was unknown, and that she was believed to be in danger." *Id.*

The next day, Detective McElfresh spoke with MJC's father. Dkt. 111-3 at 2. MJC's father stated the family found a voice message on MJC's snapchat and Detective McElfresh listened to it. *Id.* at 2-3. Detective McElfresh then spoke with MJC's sister, who, by accessing MJC's Facebook account, was able to identify an individual named Andrew Howland from Lancaster, Pennsylvania. *Id.* at 3. MJC's sister sent a screenshot of Mr. Howland's Facebook page to Detective McElfresh. *Id.* Detective McElfresh then sent an email request to Snapchat for information associated with the username "official_roo82" and stated that it was an emergency due to the age difference between MJC and Mr. Howland. *Id.*

While waiting for the response from Snapchat, Detective McElfresh ran a national database search on Andrew Howland in Lancaster, Pennsylvania for identifying information including phone numbers and email addresses. *Id.* at 4. Around 2:00 p.m. Detective McElfresh received a response from Snapchat with a phone number and email address that matched the results of his web search. *Id.* Detective McElfresh then contacted Bethany McElfresh in dispatch with a request to contact Verizon Wireless, Mr. Howland's phone carrier, to obtain "location pings" on Mr. Howland's location. *Id.* at 5. Detective McElfresh told Dispatcher McElfresh that the case involved a juvenile runaway who had suicidal ideations, had made previous suicide attempts, and that there was a large age gap between the suspect and the juvenile.  Dkt. 111-5 at 2.

7

Dispatcher McElfresh submitted to Verizon Wireless an "Emergency Situation Disclosure Form . . . limiting the real-time information requested to 48-hours" to obtain Mr. Howland's real-time location coordinates. Dkt. 111-5 at 2. Verizon provided her with the coordinates for Mr. Howland's real-time cellular location, which Dispatcher McElfresh communicated to law enforcement in Pennsylvania. Dkt. 111-3 at 5. She received real-time coordinates from Verizon from 2:46 p.m. until 7:58 p.m. Dkt. 111-5 at 2.

While dispatch was communicating the ping locations to local law enforcement agencies in Pennsylvania, Detective McElfresh submitted a preservation request to Facebook for MJC's Facebook account and Andrew Howland's account for the time period of October 1, 2020, to December 2, 2020. Dkt. 111-3 at 5. A search of the Facebook Messenger Conversation between MJC and Mr. Howland revealed numerous sexual photos with Mr. Howland and further confirmed MJC's severe emotional distress and suicidal ideation. *Id.* at 6.

At approximately 8:20 p.m., Detective McElfresh received a call from dispatch at Columbia Burrow Police Department in Pennsylvania, confirming that MJC and Mr. Howland were located together at a Comfort Inn, and that Mr. Howland was in custody. *Id.*

### IV.
### Discussion

Mr. Howland proceeds on claims under the Fourth Amendment and Federal Wiretap Act. Dkt. 82 at 7.

### A. Fourth Amendment claim

#### 1. Individual Defendants

Mr. Howland alleges that Defendants' warrantless acquisition of his real-time cell-site location information ("CSLI")[1] violated the Fourth Amendment. Dkt. 49 at 7-8.

Defendants argue that they are entitled to summary judgment on this claim because their acquisition of real-time CSLI in this situation was not a search under the Fourth Amendment, or, to the extent it was a search, it was justified by exigent circumstances. Dkt. 110 at 10–15. Mr. Howland responds that Defendants might not have been collecting real-time CSLI, but historical CSLI that is protected by the Fourth Amendment. Dkt. 115 at 37–40.[2]

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The "ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), which "'generally requires law enforcement to obtain a

---

[1] "CSLI is location information generated by cellular phone providers that indicates which cell tower a particular phone was communicating with when a communication was made. Any cell phone with a functioning battery regularly communicates with cell towers. The phone leaves behind a trail of this data." *United States v. Hammond*, 996 F.3d 374, 383 n.2 (7th Cir. 2021).

[2] The majority of the assertions and arguments in Mr. Howland's response are blanket denials of the facts that underlie his criminal conviction, along with assertions that contradict the amended complaint and his deposition testimony. Mr. Howland's story is inconsistent across his amended complaint, deposition testimony, response in opposition to summary judgment, and other filings he submitted before this Court. Mr. Howland may not contradict himself to create a dispute of fact to survive summary judgment. *See Gills v. Hamilton*, 164 F4th 640, 644-45 (7th Cir. 2026) (approving district court's decision to ignore affidavits that contradicted plaintiff's previous testimony under sham affidavit rule).

9

warrant before executing a search." *United States v. Hammond*, 996 F.3d 374, 384 (7th Cir. 2021).

The Court will assume without deciding that Mr. Howland was subjected to a "search" when Defendants obtained real-time CSLI. *See United States v. Karmo*, 109 F.4th 991, 994–95 (7th Cir. 2024); *Carpenter v. United States*, 585 U.S. 296, 310 (2018) (holding that individuals have a legitimate expectation of privacy in *historical* CSLI and specifically declining to decide if its ruling applied to "real-time CSLI").[3]

Even if *Carpenter* were extended to cover real-time CSLI data, law enforcement's actions here would be justified by exigent circumstances. A warrantless search is justified when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011). "[W]arrantless searches are permissible if law enforcement has probable cause to believe that illegal activity is occurring and that exigent circumstances are present." *United*

---

[3] It is far from clear that Defendant's actions constituted a search under the Fourth Amendment. *See Hammond*, 996 F.3d at 392 (analyzing *Carpenter* and holding that the collection of real-time CSLI over several hours for the purpose of locating a suspect did not constitute a search). While the Supreme Court's decision last month in *Chatrie v. United States* held that some short-term location data is protected, it did not extend *Carpenter* to real-time CSLI. 2026 WL 1855568, 609 U.S. --- (June 29, 2026). Instead, *Chatrie* recognized that obtaining the detailed "Location History" at issue was intrusive in large part because the "tracking capacity . . . travels back in time" and can "easily and cheaply . . . reconstruct any person's movements 'retrospectively.'" *Id.* at 10. Moreover, the location history at issue in *Chatrie* was "more fine-tuned" and more frequent than CSLI, and allowed law enforcement "to chart the movements of many individuals" who were in the area, rather than only one person. *Id.* at 11 ("Far less could [law enforcement officials of an earlier age] ever perform the tireless and absolute surveillance of any number of people in any number of places, public and private, that Location History can accomplish.").

*States v. Karmo,* 109 F.4th 991, 994–95 (7th Cir. 2024) (assuming without deciding that a search occurred and holding that exigent circumstances applied to collection of CSLI). One established exigent circumstance is to "protect individuals who are threatened with imminent harm," including in the context of "child abductions." *Carpenter,* 585 U.S. 320.

Here, Defendants were operating with the understanding that MJC was battling depression and suicidal ideation at the time of his disappearance. Dkt. 111-3 at 2; dkt. 111-4 at 2. They soon learned that MJC had been communicating via social media with an older man, who they had reason to believe was Mr. Howland. The Snapchat messages indicated that Mr. Howland planned to see MJC in person and wanted to "hold [MJC] in his arms." Dkt. 114- at 2. Under the totality of the circumstances, Defendants had probable cause to believe that illegal activity was occurring, and that there were exigent circumstances—MJC's personal safety—that justified the warrantless search. *See Karmo,* 109 F.4th at 995 ("Exigent circumstances are present if law enforcement reasonably believes that the safety of the public is threatened."); *Gaetjens v. City of Loves Park,* 4 F.4th 487, 493–95 (7th Cir. 2021).

Accordingly, Defendants are entitled to summary judgment on the Fourth Amendment claim against them.[4]

---

[4] The Court declines to address Defendants' qualified immunity and statute of limitations arguments because the Court resolves the Fourth Amendment claim on the merits. For the same reason, the Court does not address whether Mr. Howland waived any Fourth Amendment claim against Deputy Dishman in his deposition.

11

## 2. *Monell* **claim against Jackson County Sheriff's Department**

Mr. Howland proceeds on a *Monell* claim against the Jackson County Sheriff's Department based on the allegations that it violated the Fourth Amendment through a policy of using an Emergency Situation Disclosure Form in place of a search warrant. Dkt. 49 at 3-8; dkt. 82 at 7.

In order to maintain a § 1983 claim against the Sheriff's Department, Mr. Howland must show that his constitutional rights were violated by a policy or custom of Jackson County Sheriff's Department. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694–95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, Mr. Howland must first show that he was deprived of a federal right, and then that the deprivation was caused by a Jackson County Sheriff's Department custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Mr. Howland fails on the first prong. As explained above, Defendants are entitled to summary judgment on the merits of his Fourth Amendment claim. Accordingly, he cannot show a violation caused by a policy of Jackson County Sheriff's Department, and the Department is entitled to summary judgment. *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee.").

12

### B. Federal Wiretap Act

Mr. Howland alleges that Detective McElfresh and Dispatcher McElfresh illegally obtained his location data in violation of the Federal Wiretap Act. Dkt. 49 at 5-6. Defendants argue that Mr. Howland's Federal Wiretap Act claim fails because the data that was intercepted was not "content" for purposes of the statute. Dkt. 110 at 21. Alternatively, they argue that they are entitled to qualified immunity. *Id.* at 22–25.

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Once the defense of qualified immunity is raised, a defendant is entitled to dismissal unless a plaintiff comes forward with facts showing a constitutional violation and law showing his right was 'clearly established' at the time of the alleged violation." *Thomas v. Carmichael*, 164 F.4th 1058, 1067 (7th Cir. 2026). To be "clearly established," a right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson*, 483 U.S. at 641). "The plaintiff bears the burden of demonstrating that a right was clearly established at the time the

13

alleged violation occurred." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017).

"To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts" make out a violation of the right, and (2) that the right "was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). The court may analyze the qualified immunity prongs in any order it chooses. *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019). "If *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018).

The Wiretap Act provides that "any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication" shall be found in violation of the statute and subject to civil or criminal penalties. 18 U.S.C. § 2511(1)(a). It defines "intercept" as the acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C. § 2510. A plaintiff therefore may only bring a claim under the Federal Wiretap Act for the interception of content. 18 U.S.C. § 2510(4). "Content" under the Wiretap Act is defined as including the "substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

Defendants argue that CSLI does not qualify as content because it reveals *where a phone is*, not what was said or transmitted. Dkt. 110 at 21 (citing *Hammond*, 996 F.3d at 384–85 (analyzing CSLI as "non-content

14

information" under Section 2703 of the Stored Communications Act)). In these circumstances, *Hammond*'s description of CSLI as "non-content information" for purposes of the Stored Communications Act would likely apply equally to the definition of "content" under the Federal Wiretap Act. 18 U.S.C. § 2510(4). Similarly, in *Yunker v. Pandora Media, Inc.*, the court discussed several different types of "non-content" information for purposes of the Federal Wiretap Act, including geolocation data collected by Apple that was "generated automatically, rather through the intent of the user. No. 11-CV-03113 JSW, 2013 WL 1282980 at *6–7 (N.D. Cal. Mar. 26, 2013) (citing *In re iPhone Application Litigation*, 844 F. Supp. 2d 1040 1062, (N.D. Cal. 2012)). In his response, Mr. Howland discusses *Hammond* and *Yunker*, but does not provide any case or argument showing that he had a clearly established right under the Wiretap Act to not have his CSLI obtained and reviewed by investigators as they searched for MJC, who they had good reason to believe was in danger. *See* dkt. 115 at 88-90.

Moreover, while neither the Seventh Circuit nor the Supreme Court have defined "content" for purposes of asserting a Wiretap Act claim, *Hammond* indicates that the real-time CSLI at issue here is unlikely to qualify as "content" under the statutory definition. 996 F.3d at 384–85. In *Zynga Privacy Litigation*, the Ninth Circuit interpreted "contents" to mean "the intended message conveyed by the communication." 750 F.3d 1098, 1106 (9th Cir. 2014). *Zynga* distinguished the contents of a communication from the "record information," which is "information regarding the characteristics of the message that is

generated in the course of the communication." *Id.* (*e.g.*, for a phone call, a call's "origination, length, and time" are not the call's content, but instead record information, because those items contain "no 'information concerning the substance, purport, or meaning of [the] communication.'").

Considering these cases and the lack of controlling precedent addressing the issue, Defendants are entitled to qualified immunity on the Wiretap Act claim. *See Wesby*, 583 U.S. at 63 (To be "clearly established," a right "must have a sufficiently clear foundation in then-existing precedent."). Indeed, Mr. Howland has not identified a Seventh Circuit or Supreme Court case showing that it was clearly established that the real-time CSLI data was "content" for purposes of the statute. It was Mr. Howland's burden to do so, which "is a 'do or die' requirement" for his claim. *Villalobos v. Picicco*, 168 F.4th 1057, 1063 (7th Cir. 2026) ("If a plaintiff fails to identify analogous precedent clearly establishing the law, the district court must grant summary judgment for the defendant."); *accord Thomas v. Carmichael*, 164 F.4th 1058, 1067 (7th Cir. 2026).

Defendants are therefore entitled to summary judgment based on qualified immunity on the Federal Wiretap Act claim against them.

## V.
## Conclusion

Defendants' motion for summary judgment is **GRANTED**. Dkt. [108]. Mr. Howland's motion for sanctions against Defendants and Defense Counsel, dkt. [122], is **DENIED**.

16

Final judgment shall issue by separate entry.

**SO ORDERED.**


Date: 7/15/2026

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana



Distribution:

ANDREW EVAN HOWLAND QN6721
SCI BENNER TOWNSHIP
301 Institution Drive
Bellefonte, PA 16823

All Electronically Registered Counsel